02-11-505-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00505-CV

 

 


 
 
 In the Interest of L.E.M. and S.G.M., Children
 
 
  
 
 
  
 
 
 
 
  
  
  
 
 
 
 
  
 
 
  
 
 
  
 
 


----------

FROM THE 323rd
District Court OF Tarrant COUNTY

----------

MEMORANDUM
OPINION[1]

----------

After
a bench trial, the trial court found by clear and convincing evidence that Appellants
D.M.M. (Father) and S.T. (Mother) engaged in conduct or knowingly placed their daughters
L.E.M. and S.G.M. with persons who had engaged in conduct that endangered
the physical or emotional well-being of the children and knowingly placed or
knowingly allowed L.E.M. and S.G.M. to remain in conditions or surroundings
that endangered their physical or emotional well-being.[2] 
The trial court further found that termination of Father’s and Mother’s
parental rights was in the children’s best interest.[3] 
Based on these findings, the trial court terminated the parental relationship
between Father and Mother and daughters L.E.M. and S.G.M.

In
two issues, Father contends that the evidence is legally and factually
insufficient to support the endangerment and best interest findings against him
and complains that the order of termination violates his federal and state
rights to due process.  In four issues, Mother contends that the evidence is
legally and factually insufficient to support the endangerment findings against
her and that the trial court abused its discretion by denying her motion to
extend the dismissal date and her final oral motion for continuance.  Because
we hold that (1) the evidence is legally and factually sufficient to support
the trial court’s endangerment findings against both parents and the best
interest finding against Father, (2) the termination order does not violate
Father’s rights to due process, and (3) the trial court did not abuse its
discretion by denying Mother’s motion to extend the dismissal date or by
denying her final oral motion for continuance, we affirm the trial court’s
judgment.

Sufficiency
of the Evidence

In
proceedings to terminate the parent-child relationship brought under section
161.001 of the family code, the petitioner must establish one ground listed
under subsection (1) of the statute and must also prove that termination is in
the best interest of the child.[4] 
Both elements must be established; termination may not be based solely on the
best interest of the child as determined by the trier of fact.[5]

Termination
decisions must be supported by clear and convincing evidence.[6]  Evidence is clear and
convincing if it “will produce in the mind of the trier of fact a firm belief
or conviction as to the truth of the allegations sought to be established.”[7]  Due process
demands this heightened standard because termination results in permanent,
irrevocable changes for the parent and child.[8]

In
evaluating the evidence for legal sufficiency in parental termination cases, we
determine whether the evidence is such that a factfinder could reasonably form
a firm belief or conviction that the challenged ground for termination was
proven.[9] 
Here, Father and Mother each challenge the endangerment findings against them under
subsections (D) and (E) of section 161.001, and Father challenges the best
interest finding against him.[10]

We
review all the evidence in the light most favorable to the finding and
judgment.[11] 
We resolve any disputed facts in favor of the finding if a reasonable
factfinder could have done so.[12] 
We disregard all evidence that a reasonable factfinder could have disbelieved.[13]  We consider
undisputed evidence even if it is contrary to the finding.[14]  That is, we consider
evidence favorable to the finding if a reasonable factfinder could, and we
disregard contrary evidence unless a reasonable factfinder could not.[15]

We
cannot weigh witness credibility issues that depend on the appearance and
demeanor of the witnesses, for that is the factfinder’s province.[16]  And even when
credibility issues appear in the appellate record, we defer to the factfinder’s
determinations as long as they are not unreasonable.[17]

In
reviewing the evidence for factual sufficiency, we give due deference to the
factfinder’s findings and do not supplant the judgment with our
own.[18] 
Here, for each parent, we determine whether, on the entire record, a factfinder
could reasonably form a firm conviction or belief that the parent violated subsection
(D) or (E) of section 161.001(1).  For Father, who challenged the best interest
finding, we also determine whether, on the entire record, a factfinder could
reasonably form a firm conviction or belief that the termination of his parental
rights to the children is in their best interest.[19]
 If, in light of the entire record, the disputed evidence that a reasonable
factfinder could not have credited in favor of the finding is so significant
that a factfinder could not reasonably have formed a firm belief or conviction
in the truth of its finding, then the evidence is factually insufficient.[20]

As
we have explained in a similar case,

Endangerment
means to expose to loss or injury, to jeopardize.  The trial court
may order termination of the parent-child relationship if it
finds by clear and convincing evidence that the parent has knowingly placed or
knowingly allowed the child to remain in conditions or surroundings that endanger the physical or emotional well-being of the child.
 Under subsection (D), it is necessary to examine evidence related to the
environment of the child to determine if the environment was the source of
endangerment to the child’s physical or emotional well-being.  Conduct of
a parent in the home can create an environment that endangers
the physical and emotional well-being of a child.

.
. . . Under subsection (E), the relevant inquiry is whether evidence exists
that the endangerment of the child’s physical or emotional well-being was the
direct result of the parent’s conduct, including acts, omissions, and failures
to act.  Termination under subsection (E) must be based
on more than a single act or omission; a voluntary, deliberate, and conscious
course of conduct by the parent is required.

To
support a finding of endangerment, the parent’s conduct does not necessarily
have to be directed at the child, and the child is not required to suffer
injury.  The specific danger to the child’s well-being may be inferred
from parental misconduct alone, and to determine whether termination
is necessary, courts may look to parental conduct both before and after the
child’s birth . . . . As a general rule, conduct that subjects a child to a
life of uncertainty and instability endangers the child’s
physical and emotional well-being.[21]

Additionally,
a parent’s mental state may be considered in determining whether a child is endangered if that mental state allows the parent to engage in
conduct jeopardizing the child’s physical or emotional well-being.[22]
 Finally, even if a parent makes dramatic improvements before trial,
“evidence of improved conduct, especially of short-duration, does not
conclusively negate the probative value of a long history of . . .
irresponsible choices.”[23]

Father
admitted to being involved in a domestic violence incident with Mother on
September 1, 2007, in which he hit her in the mouth, slammed her against the
wall, and slammed her against the door.  He also admitted that L.E.M. was in
the apartment at the time.

On
April 17, 2009, the police responded on two separate occasions to two separate
domestic violence incidents occurring between Father and Mother.  Officer Eric
Montgomery responded to a 10:30 a.m. call.  By the time he reached Mother’s
home, MedStar was attending to her as she lay on the floor.  In response to
Montgomery’s repeated questions, Mother told him that she had fallen and hit
her head.  When he asked her again what had happened, she told him that she had
high blood pressure and seizures that had caused her to hit her head.

At
around 3:00 p.m., Montgomery assisted Officer Veronica Coronado in responding
to another assault call.  Mother was at a convenience store, wearing her
pajamas.  Mother told Montgomery that she had lied to him about how she had sustained
her injuries in the earlier incident because she loved Father and did not want
him to get in trouble.  She admitted that Father had pushed her down and caused
her to hit her head.

Mother
told Coronado that Father had assaulted her that morning, she had gone to the
hospital for her injuries and had been released, and then he had attacked her
again.  Mother told Coronado that Father had pushed her about ten times and had
punched, slapped, and choked her.  Mother reported to Coronado that Father had
said to her, “Bitch, if you love me, you will fight for me.  . . . Are
you tired of fighting for me?  Hit me back.”  Coronado testified that Mother
had scratches on her face and minor abrasions on her neck.  Mother admitted to
Coronado that the second incident was precipitated by her getting upset that
Father was receiving text messages from another woman.

Coronado
then went to speak with Father.  Father told her that he and Mother had continued
to argue after her release from the hospital and that she scratched him and
ripped his necklace, causing abrasions on his neck.  Father also told Coronado
that Mother had almost run over him as she had driven off after the incident.

About
six months later, at almost 2:00 p.m. on October 19, 2009, Officer Chris
Bolling responded to a domestic disturbance call at Mother’s home.  He spoke to
Father and Mother.  Father told Bolling that he and Mother had been “tussling
over the keys and she fell into the wall.”  Father also admitted to Bolling that
he had punched Mother in the mouth.

Bolling
testified that Mother’s lip had been swelling and was bleeding and that her eye
looked swollen as well.  Mother told him that she and Father had been fighting
because he had cheated on her.  She also told Bolling that Father had punched
her with his closed fist several times.  Bolling testified that a child was in
the home at the time of the incident and that he believed it was Mother’s
child.  Bolling asked Mother if she wanted an emergency protective order and
told her that “she needed to end the relationship for the good of her child and
[that] the [emergency protective order] would help her.”  The police arrested
Father for assault/family violence with bodily injury.

Mother
testified that L.E.M. and S.G.M. “saw everything,” including the beating, the
police arresting Father, and the ambulance taking Mother to the hospital.  Father
admitted that he was placed on deferred adjudication for this conduct.

Officer
Francisco Solano testified that on January 7, 2010, he responded to a criminal
mischief report at Mother’s home.  When he arrived, he saw several items on the
floor, including an entertainment center, a television, and a Christmas tree. 
Ornaments lay on the floor, and some had broken into smaller pieces.  Mother
told the officer that she had invited a neighbor into her apartment and that
Father had entered the apartment directly behind that guest.  Mother told
Solano that Father had told her that he wanted to get back together, and he
became upset when she told him that she had begun a relationship with someone
else.  Mother reported to Solano that Father had told her that he was “going to
beat [her] face in” and that he was “going to kill [her.]”  Mother also told
Solano that Father had thrown the Christmas tree and entertainment center down
on the floor, and the ornaments had broken.  At least one of the daughters was in
the apartment during the incident.  Mother told Solano that her daughter ran
into her room yelling, “Don’t hurt Mommy.”  Solano opined that when a domestic
violence incident occurs in a child’s presence, then that child is endangered.

Teresa
Moreno, a family based safety services (FBSS) supervisor for the Texas
Department of Family and Protective Services (TDFPS), testified that in August
2010, when L.E.M. and S.G.M. were approximately four years old and two years
old respectively, TDFPS received a referral alleging neglectful supervision of them,
drug use by Mother, and domestic violence.  Specifically, L.E.M. had made an
outcry that Father had spanked her, and she was bruised.  Additionally, someone
had reported that the children had been playing outside their apartment complex
unsupervised.  Mother told Moreno that she had seen bruises on “the little
baby” and confirmed to Moreno that Father had caused that bruising.  Moreno
testified that she became concerned that the domestic violence was severe when
she saw a lot of holes in the apartment walls and that the door had been kicked
in.  Mother told Moreno that Father had made the holes in the walls with his
fists.  The children’s room contained holes in the walls as well.  Father
admitted later to TDFPS that he had put the holes in the walls, but he did not
understand why TDFPS was concerned because he had paid for the damages.

TDFPS
began offering FBSS services in September 2010.  The parents did not complete
any of the services during the FBSS portion of the case except that Mother
completed a psychological evaluation.  The children were placed with Mother and
were to have only supervised contact with Father.

Officer
Justin Swindell of the Fort Worth Police Department testified that he responded
to a hit-and-run call on October 25, 2010.  Father told Swindell that he had
been driving along the highway when a red, four-door Geo Metro vehicle hit
him.  Father told Swindell that he had exited and stopped to exchange
information with the other driver.  But the other driver sped off.  Father told
Swindell that “one of the [Geo’s] windows had been busted out” and that the
driver looked like Mother.  Father told Swindell that he had called Mother, who
had said, “[H]a, ha, ha, how did you like that, motherfucker[?]” and hung up. 
Swindell testified that red scrapes on the left side of Father’s car were
consistent with his story.  Swindell also testified that he overheard a woman whom
he believed to be Mother’s sister tell Father in a telephone call that Mother
had been driving a red Geo Metro earlier that day.

The
police went to the apartment where Mother and the children were living and saw
a red, four-door Geo Metro vehicle with damage to its right side.  Although at
first she told the police that she had not committed the hit-and-run, Mother admitted
at trial that she had hit Father’s car but contended that she did not do so
intentionally.  Mother was arrested and charged with aggravated assault with a
deadly weapon.  Our review of the record did not reveal that any evidence of
prosecution for that offense was admitted at trial.  Father, who was supposed
to have only supervised contact with the children, was allowed to take the
children after Mother’s arrest.  Father took the children to his mother’s house.
 Mother testified that the children should not have been placed with Father’s
mother because she uses cocaine.

Before
the alleged hit-and-run, Mother had confided to TDFPS that her father had
molested her when she was a child.  Mother also admitted to TDFPS that her
father had stayed with her and the children from time to time.  Officer Swindell
testified that he confirmed that Mother had left the children with her father at
the apartment while she was gone on the day of the alleged hit-and-run.  Father
also told Moreno that Mother had left the children with her father during the
incident, and the police confirmed it to TDFPS.  Mother denied that accusation
at trial and stated that she had left the children with a neighbor, not their
grandfather, while she was out in the Geo.

Moreno
testified that Father notified TDFPS that Mother had been arrested after the
alleged hit-and-run and that she was still in jail.  The children were then
placed with his mother.  Moreno testified that that placement later broke down
because Mother would show up at various times of the day to see the children
instead of respecting the times of visitation and because the children’s paternal
uncle, who had a criminal history involving allegations of sex abuse, moved in
with the grandmother.  Father testified that the breakdown of the placement had
more to do with the restrictions placed on how many hours a day he could stay
with the children at his mother’s home and her finances.  The children were next
placed with a neighbor of Mother’s.

Officer
Philip Rice testified that he responded to a “fight” call on January 16, 2011
at a Quick Trip gas station and that he followed a crowd from that location to
an apartment complex catty-cornered to the gas station.  Mother was in the
group, and she told him that she had been fighting with another woman because
Mother had slept with the other woman’s boyfriend.  Rice issued the women citations
for disorderly conduct.

Mother’s
neighbor who was caring for the children was also involved in the fight, and
both women were evicted.  At that point, according to Moreno, the children were
removed from the family and placed in non-relative foster care because there
were no other placement options.

Moreno
testified that Mother tested positive for marijuana during the FBSS portion of the
case and that TDFPS had concerns about her mental health because Mother
reported that she had been diagnosed as being bipolar but was not taking
medication.

Mark
Matthews, a licensed clinical psychologist, testified that he had performed a
psychological evaluation of Mother in December 2010.  Mother had told him that
her father had a history of substance abuse, had been physically abusive to the
family, and had molested her.  Mother also told Matthews that she had been
admitted to Austin State Hospital when she was thirteen years old and that she
had been previously diagnosed with an anxiety disorder, bipolar disorder,
depression, and an eating disorder.  She also reported a history of “nervous
breakdowns” and self-mutilation.

Regarding
drug use, Mother told Matthews that she began smoking marijuana when she was
eleven years old.  She told him that she smoked “every day, all day” at her
heaviest use, stopped when she discovered that she was pregnant with L.E.M.,
resumed that level of smoking after L.E.M.’s birth until the pregnancy with
S.G.M., and then resumed smoking every two or three days after S.G.M.’s birth.

Emotionally,
Mother told Matthews that she was ‘‘not right,” and he noted that her mood was
generally euphoric or upbeat during the interview.  She told him that she has
trouble sleeping, gets two to four hours of sleep a night, and frequently goes
“four or five days without sleeping.”  She also told him that her appetite was
unstable.

Matthews
testified that he diagnosed Mother with cannabis abuse, a bipolar II disorder,
post traumatic stress disorder, partner relational problems, and physical
abuse.  He also recommended a psychiatric evaluation so that she could be
evaluated for medication, but he testified that he did not believe that he had
discussed the need for a psychiatric examination directly with Mother.

Ashley
M. Williams, the third TDFPS caseworker on the case and the second since the
January 2011 removal, testified that the first caseworker had given the parents
their service plans.  When Williams was assigned to the case in May 2011,
Mother had completed only her psychological examination and domestic violence
classes.  Mother and Williams had a long talk, during which Mother told
Williams that she and Father were “working things out.”  The women also talked
about the services that Mother still needed to complete, like counseling and
the psychiatric evaluation.  Williams testified that Mother had already been
told to get the psychiatric evaluation before Williams was placed on the case
and that Mother had known to do so “for almost a year” before the trial.  The
women also discussed Mother’s living situation.  At that point, she was living
with Father’s father and his girlfriend.  Williams was concerned that this
living situation meant that Mother had not cut ties with Father.

When
Williams spoke with Father the next day, he confirmed that he and Mother “were
trying to work things out.”  Father had not completed any of his service plan,
which included completing courses in anger management and batterers’
intervention, completing counseling sessions, and achieving stable income and
housing.  Williams told Mother that “it would be difficult for [TDFPS] to
consider reunification if the parents were together and not completing
services.”

Williams
testified that when TDFPS learned that the parents were back together, TDFPS
changed the parents’ visits with the children from individual visits to joint
visits.  But Williams testified that “around June,” the children’s behavior
“became so extreme” that TDFPS separated the visits again, with the parents’
agreement.

Williams
also testified that Mother got in a fight with Father’s father’s girlfriend in
June 2011.  Williams stated that Mother later admitted to her that she was pregnant
at the time.  Despite her efforts, William was unable to speak with Mother from
the end of June until July 21, 2011.  Williams testified that on that day, Mother
told her that she and Father were sexually involved and had spent the previous
weekend together.  Williams told both parents that TDFPS’s goal had changed
from reunification to termination.  She discussed the parents’ service plans
with them again.  She strongly encouraged Mother to seek counseling and get her
psychiatric evaluation.  Williams spoke to Father about counseling and his
batterers’ intervention classes.  Williams testified that by this July meeting,
the parents had completed their parenting class and Mother had begun working.  On
August 18, 2011, Mother had her first counseling appointment with Connie
Burdick.

But
on August 25, 2011, Mother called Williams to report that Father had called her
and threatened to cut her throat.  And in late October 2011, Mother told
Williams that Father continued to threaten to cut her throat and “things of
that nature,” and Mother showed Williams her cell phone indicating thirty
missed calls from him.  Williams stated that Mother admitted to her that she
sometimes knowingly answered his calls.  Williams also testified that in
October 2011, the month before trial, Father told her that Mother had called
him to report that she had miscarried.  At trial, he testified that he had not
said that.  Instead, he testified that he had told Williams that “word out on
the street was [that Mother] had a miscarriage.”

Williams
stated that Mother did not complete her psychiatric evaluation until early
September 2011.  As far as housing, by September 2011, Mother had moved in with
a friend at work who had a young child.  But Mother did not move into her own
apartment until November 1, 2011, less than a month before trial.  The
apartment is only about five minutes from Father and his family, and Mother
told Williams that Father knows which apartment complex Mother lives in.

Williams
testified that the parents had made minimal progress toward addressing her
concerns.  Williams admitted that Mother was working, had had three or four
clean drug tests, had completed her domestic violence classes, had progressed
in individual counseling, had completed her psychiatric evaluation, and had
been on medication for a couple of months.  Williams also admitted that she had
seen progress in Mother.

Nevertheless,
Williams was concerned about Mother’s not starting her services until several
months into the case, her staying in a relationship with Father until late
July, her ability to take care of her mental health needs in the long run, and the
chronic history of domestic violence.  Mother herself had told Williams that
mental health issues had caused much of Father and Mother’s past conduct.

Williams
was also concerned that Mother’s “preoccupation with men” could affect her
ability to care for L.E.M.’s mental health needs and that Mother would put her
own needs ahead of L.E.M.’s.  Williams explained that she did not believe that
Mother would protect the children:

[I]n the past she has
shown that she cannot be protective, that she is always allowing him to come
back into her life.  They’ve always just continued to try to be in a
relationship with each other over the past five years.  And I don’t know how we’ll
ever be able to determine whether or not she is truly done with that
relationship.

Mother’s Facebook page contained posts from
Mother that concerned Williams.  The post from October 1, 2011 reads,

Tonight
was wild we went to the park at 12 something and got hemmed up by the cops lol how
they saw us still got us puzzled worst part he has a warr[a]nt an[d] I got two but
we both were able to go home tonight Myst say[s] it would [have] been a good
story to tell in [j]ail tho[ugh] Lmao[.]

Williams
testified that “Lmao” means “laughing my ass off.”

The
October 29, 2011 post from Mother reads, “Whoo hooooo lol having fun drinking omg
pi like a mother right now …..hahaha lovin that I’m free of the old I’m free so
free lovin every moment[.]”  The post was published less than a month before
trial, after the psychiatric evaluation, and soon after Mother had been placed
on prescription medication regarding her mental health.

Williams
was concerned about Father as well.  He had not completed his service plan, so
she had “no way to tell where he [was] at in his ability to care for [the
children].”  She also testified that he told her that “the plan all along was
for [Mother] to get the children back” and that he used that as his excuse for
not doing his services.  Williams testified that she did not believe that it
would be safe to return the children to either parent and that termination of
the parental rights would be in the children’s best interest.

Williams
testified that the children had been placed in their third foster home as of
April 30, 2011, because the first two homes could not manage L.E.M. and felt
she was a risk.  Williams also testified that L.E.M. was hospitalized in
February 2011, June 2011, and twice in September 2011 and had “homicidal and
suicidal ideation[s],” auditory hallucinations, and was hearing voices. 
According to Williams, “[L.E.M.’s] behaviors were just out of control.”

The current
foster mother testified that L.E.M. had “outbursts, rages.  She was
destructive.  She would try to tear apart her clothes.  She would try to
destroy toys.  She would harm the animals.”  S.G.M. also had issues.  According
to the foster mother, S.G.M. “had really long tantrums” and “would beat her
head against the ground,” as would L.E.M.  L.E.M. “would also twist her hair
and then pull it out.”

The
foster mother testified that at first, L.E.M. and S.G.M. were being bathed
together, but L.E.M. “simulated sexual acts with her sister.”  The foster
mother testified that she and her husband then started bathing the sisters
separately.  But the foster mother testified that L.E.M. “simulated sex with
her sister again in the living room” and also stuck “a Ken doll up Barbie’s
skirt and [made] . . . slurping noises.”

The
foster mother also testified that L.E.M. had told her that Father had held a
knife to her face and that both L.E.M. and S.G.M. had said that their parents
punched really hard, that the children were poked in the eyes when they
misbehaved, and that they were kicked out of the house for misbehavior.  Both children
also reported that S.G.M. was burned on her hip.

One
night in June, the foster mother heard choking sounds via the baby monitor in
the girls’ room.  The next day, L.E.M. confessed to choking her sister.  Also
in June, L.E.M., who had an interest in knives, found a pair of nail clippers. 
(After the choking incident, the foster parents had locked the knives up.) 
When asked to give the clippers to the foster parents, L.E.M. refused and
started beating her head against a brick wall.  She was then admitted to a
mental health treatment facility.

Jennifer
Didier, a licensed social worker and therapist for the Excel Center, a day
treatment center for children and adolescents, testified that after leaving the
mental health treatment facility in July 2011, L.E.M. was admitted to the Excel
Center (even though the center typically does not treat children under five
years of age) because of the severity of her problems.  Didier explained,

When
[L.E.M.] came into our program, at home she was having a lot of physical and
verbal aggression towards her foster parents and then also her sibling.  She
would have rages to where she wasn’t able to control herself for extended
periods of time.  She was also having nightmares and trouble sleeping.  And
then within our program just a lot of inattentiveness, easily distracted.  I
didn’t see aggression within our program, but she would at times appear to be
having flashbacks when she would be talking about particular things.  She was
having some hypersexual behaviors with other peers in our group.

Didier
testified that on July 7, 2011, L.E.M. told her that Mother had beaten her and
hit her.  On July 15, 2011, L.E.M. stated that her parents had kissed her all
over her body, including her genital area.  The foster mother testified that in
mid-July, L.E.M. told her the same and also that it occurred while L.E.M. and
her parents watched “nasty movies.”  On July 18, L.E.M. told Didier that when
her parents would hit her, she would hide in the closet.  On July 19, 2011, L.E.M.
told Didier that she had watched “nasty movies” with Mother that made L.E.M.
feel bad and that Mother had touched L.E.M.’s “pee pee.”  On July 21, 2011,
Didier received a written report from the foster mother that L.E. M. was

continuing to have
nightmares at home and that—[L.E.M.] reported having visual and auditory
hallucinations and that [L.E.M.] reported the voices telling her to hit things
and say bad words.  . . . [The foster mother] also reported that [L.E.M.] ha[d]
started engaging in hypersexual talk about men and women licking in nasty ways.

Williams
received notification that L.E.M. had made an outcry of sexual abuse.  It was
ruled out against the parents.

L.E.M.
also told Didier that she had been seeing bugs crawling on cabinets and under
her bed.  L.E.M. further reported to Didier that “her father would punch holes
in the walls and hit her mother and sibling” and that he moved in and out of
the home often.  L.E.M. told Didier that she would get scared, her body would
shake, and she would hide in the closet.  After sharing this information,
L.E.M. isolated herself from the other children in the group.  Didier also
noticed that L.E.M. would get a “blank stare” or a “very blunt [a]ffect” on her
face for fifteen or twenty seconds when discussing more traumatic events.

Didier
testified that L.E.M. seemed to decompensate after visits with her parents—her
aggression would increase; her hypersexuality in group sessions increased; and
Didier would receive reports of nightmares, flashbacks, and hallucinations.  So
Didier suggested to the CASA volunteer that visits with the parents be
suspended while L.E.M. was in treatment.  Didier believed that would be in
L.E.M.’s best interest.

The
CASA volunteer, Cynthia Sinor, testified that Father brought gifts and food to
the visits and sometimes other people.  She also said that he “spen[t] a lot of
time tickling the girls roughly.  And he. . . also ha[d] a habit of—sort of
scaring them with the policeman is going to come and get them if things don’t
go right, which [was] kind of upsetting to [Sinor] and a little upsetting to
the kids sometimes.”

Didier
testified that it would be harmful to the emotional and mental well-being of a
child to be exposed to domestic violence and physically or emotionally
endangering to a child to have been hit by her parents and sexually abused as
L.E.M. had described.  When asked how children exposed to domestic violence
behaved, Didier replied,

Some
children exhibit a lot of anxiety and depression.  Other children become very
inattentive, irritable, decreased attention span.  And some have a mixture
of—of both of those types of varying behaviors.  Kids be—can become verbally
and physically aggressive, kind of mirroring the behaviors that they’ve
witnessed.  Sometimes kids kind of start ganging up on children that are
younger than them and becoming more aggressive or intimidating.

Didier
testified that she considered L.E.M.’s behavior, including her aggression
toward her younger sister, consistent with her having experienced domestic violence.

When
asked how children who have been sexually abused react, Didier replied,

Children that are
sexually abused, it’s—can be very similar to children who have been exposed to
domestic violence.  Again, with—it almost looks like they would have ADHD, it’s
kind of hyperactive behavior, inability to focus, inattentiveness, but a lot of
hypersexual behavior, which by that I mean poor boundaries with others,
inappropriate touching, touching of others or themselves, whether it’s
masturbating.  They can also have nightmares and flashbacks.  Sometimes
hallucinations, it just depends on the level of acuity for the child.

Didier
testified that she saw L.E.M. touch another student’s clothed bottom with a
pencil and that L.E.M. was always touching the other children and always
wanting to give and receive hugs from the adult staff at the center.  Didier
characterized this behavior by the four-year-old as hypersexual.

Mother
admitted that she had “fail[ed] to protect [her daughters] at the beginning.” 
But she testified that the reason for her prior inability to protect her
children was that she “was sick [her]self.  [She] was a battered woman.”

Father
contended that he had had no unsupervised contact with his daughters after
October 2009 except for the day of the alleged hit-and-run in October 2010.  But
Mother testified that Father had seen the children unsupervised a few times
since the October 2009 assault.  Nevertheless, Father denied the allegations of
sexual abuse made by L.E.M.  He also denied that he poked his daughters in the
eyes and that they were afraid of him and hid in the closet.

The
foster mother testified that in early September 2011, L.E.M. exhibited a lot of
rage against the foster father and was still behaving destructively.  S.G.M.
started to imitate that behavior.  On cross-examination, the foster mother
testified that she had no knowledge of anything happening in the home that
would cause L.E.M. to fear her husband and that her general impression was that
L.E.M. does not like men.

L.E.M.
was admitted to a mental health treatment facility again, and from there, in
late September 2011, she was admitted to a residential treatment center (RTC) in
Austin.  As Didier explained, an RTC “is for patients who—their behavior is so
severe that going inpatient for a couple weeks is not enough.  It is a
long-term treatment facility.  It’s a psychiatric hospital.  So patients
typically go there for six to [twelve] months.”  Didier had never had a patient
as young as L.E.M. placed in an RTC.

The
foster mother testified that L.E.M. has been diagnosed with severe
posttraumatic stress disorder, severe depression with psychosis, oppositional
defiance disorder, ADHD, and reactive attachment disorder.

Williams
testified that she told the parents to let her know when they wanted to visit L.E.M.
and she would arrange it with the RTC and provide Greyhound bus passes if
necessary.  Williams also testified that Mother told her that her sister could
possibly take her to Austin and that Father told her that “they would possibly
be able to make arrangements to visit.”  But neither parent had visited L.E.M.
by the time of trial.  Mother testified that she had not visited L.E.M. in
Austin because she could not secure transportation, but she admitted that she
went to California for Thanksgiving to visit her boyfriend’s family because “[s]omebody
took [her.]”  The foster parents and S.G.M. did visit L.E.M. regularly at the
RTC, including the weekend after Thanksgiving Day.  The foster maternal
grandmother also visited L.E.M. at the RTC.

Williams
testified that both parents had called L.E.M. occasionally at the RTC.  On
cross-examination, she admitted that Mother had made twenty calls, Father had
made five or ten, and the foster parents had made seven.  Williams testified
that on one of the phone calls between L.E.M. and Mother, L.E.M. said, “[Y]ou
and dad tried to kill each other with a knife,” and she told Mother that it had
scared her.  In another, L.E.M. asked about Father buying a new Christmas
tree.  In one conversation with Father, L.E.M. told him to never break the
Christmas tree.  Similarly, in a later telephone conversation with Father,
L.E.M. asked if he and Mother would get married and asked him not to break her
Christmas tree.  In a different telephone conversation with Father, he stated
that he wanted to squeeze L.E.M. until she “barf[ed] on [herself], and L.E.M.
stated, “I don’t love Daddy.”

Williams
testified that at the time of trial, S.G.M. was in the same foster home, and
L.E.M. remained in the RTC in Austin.  Williams stated that L.E.M. was then
“having some issues” but was “somewhat stable.”  Later, Williams admitted that
L.E.M. had “somewhat deteriorated at the RTC,” that she was “zoning out” and
having severe tantrums, and that she had been placed in a room alone because of
her behaviors.  Nevertheless, she attended regular school.

Williams
testified that TDFPS’s plan is for the children to be adopted and that the
foster parents are adoption-motivated.  Williams explained that “[t]he adoption
subsidy would . . . provide ongoing Medicaid coverage” and
that the children would also receive “free college and things of that nature.”

Williams
testified that she did not believe that the parents could meet the children’s
present and future emotional and physical needs but that she did think that the
foster parents could meet those needs.  Williams admitted that TDFPS had not
offered the parents any training on dealing with the children’s behaviors or
special needs.

Although
Father was working at the time of trial and making minimum wage, he was staying
with a friend rent-free until he could “get on [his] feet.”  Father did not
know his friend’s last name or whether he had a criminal history.  He had not
paid any child support for the children’s care.  He had a car but no car insurance. 
Further,
Mother
testified that Father missed most of his visits with the children.

Williams
stated that Father’s plan was that Mother would have custody of the children,
and Mother had stated that she would have the children in counseling and
“utilize any support that she could to take care of them.”  But Williams
testified that Mother has not been able to show the stability of her home
because she had only been in her apartment about a month when trial began.  Williams
further testified that “a lot of [L.E.M.’s] suicidal [and] homicidal ideations
. . . occurr[ed]” after visits with Mother.  “The children would reenact
domestic violence in the home.  They would say . . . that [the]
police [were] going to come to get [them].”  Williams testified that S.G.M.
also had some negative behaviors after visits, such as pulling her hair and
acting more defiantly.  The foster mother testified that the girls were very
agitated after visits with their parents.  “They often had rages immediately
after.”  Two weeks before trial, S.G.M. had a visit with Mother, and afterwards
she spread her feces on the bathroom wall.

Regarding
her concerns about returning the children to their parents, Sinor explained,

Originally I was
okay, I thought Mom—I know that they love—I know they love the children.  And I
was very much on the mom’s side, and I was really trying to help.  And then as
the behaviors became more aggressive and more—you know, just nastier, I just
felt that they will be difficult for Mom and Dad or either one or both to be
able to provide for them.  I feel that there are triggers there that are going
to send these kids—you know, can affect the kids at any time, so that they
can’t—And you can’t control those triggers.  If they are there, they’re going
to go.  And I just feel that they are not stable enough probably yet to have
these children back.

Sinor
admitted that she had seen Mother progress since the beginning of the case but
testified that even if Mother had completed her services soon enough to show
stability, that still would not “eliminate the problem of violence and anger
and things [like] that—that have gotten them to this point.”  Sinor testified
that she did not believe it would be safe to return the girls to their parents
and that she believed terminating the parents’ rights would be in the
children’s best interest.  Sinor testified that “it’s probably safe—very safe
for [the children] to be with the [foster parents].”

Kent
Bass, a counselor at Catholic Charities, testified that he saw Mother two or
three times.  He testified that based on what he knew of her and what she told
him, he believed that Mother is healthy enough that she could parent the
children.  He also testified that he believed that she had set up boundaries to
keep her daughters and her safe from Father, for example, by avoiding phone
contact.

Didier
opined that in the future, L.E.M. is going to require a lot of therapy.  At the
same time, Didier believes that it’s very important for L.E.M. “to be in a very
stable and nurturing and understanding environment.”  Williams testified that
the foster home is a stable placement for the children “[a]t this time.”  The
foster mother testified that she would be willing to have L.E.M. live in her
home again after she gets out of the RTC.  The foster mother also testified
that if the parents’ rights are terminated, she and her husband would be
interested in adopting the girls and that their goal is to keep the sisters
together.

The
foster mother further testified that she and her husband would make sure that
the girls had an opportunity to see a counselor on a regular basis, that she
has already checked into a school for emotionally troubled children for L.E.M.,
and that she has a flexible schedule.

Sinor
testified that L.E.M. is doing well at the RTC but also that “[s]he is
beginning to start more of those behaviors that got her to this point.”

Regarding
S.G.M., Sinor testified,

She
is very loving with the foster family.  She seems to be—she has come out—She
has become more of her own person since she is the only child in the family and
she doesn’t have to compete with anybody else.  So she is becoming more of her
own person.  She is starting to exhibit more of the behaviors, like, she will
rub herself until it hurts or she’ll pull her hair or do things like that.  I
think she is doing more of that recently.  Well, no, she did more of it when [L.E.M.]
first went to the RTC.  I think it has decreased lightly.

Sinor
testified that she believed that the placement with the foster parents is good
for S.G.M.  She further testified, “I have never seen a set of foster parents
so devoted to two children and willing to do whatever it requires to make sure
that they get what they need so that they can, you know, create a life for
themselves.”  Sinor also testified that the children have established “a big bond”
with their foster parents.

Applying
the appropriate standards of review, we hold that the evidence of Mother’s
long-term, frequent drug use; assaultive conduct, including her alleged hit-and-run
with Father as the complainant; and her failure to protect the children from
Father, combined with the children’s statements of physical abuse at her hands,
is legally and factually sufficient to support the trial court’s endangerment
findings against her.  We overrule Mother’s third and fourth issues.

Applying
those same standards of review, we hold that the evidence of Father’s repeated
acts of domestic violence against Mother, sometimes in at least L.E.M.’s
presence, coupled with the children’s statements of physical abuse at his
hands, is legally and factually sufficient to support the trial court’s
endangerment findings against him.

Father
also challenges the legal and factual sufficiency of the evidence supporting
the trial court’s finding that termination of his parental relationship with
L.E.M. and S.G.M. is in their best interest.  Consequently, in our legal
sufficiency review, we review all the evidence in the light most favorable to
the finding and judgment to determine whether the evidence is such that a
factfinder could reasonably form a firm belief or conviction that the best
interest ground for termination was proven.[24] 
In our factual sufficiency review, we determine whether, on the entire record,
a factfinder could reasonably form a firm conviction or belief that termination
of Father’s parental rights is in the children’s best interest.[25]

There
is a strong presumption that keeping a child with a parent is in the child’s
best interest.[26] 
Prompt and permanent placement of the child in a safe environment is also
presumed to be in the child’s best interest.[27] 
The following factors should be considered in evaluating the parent’s
willingness and ability to provide the child with a safe environment:

(1) the child’s age
and physical and mental vulnerabilities;

(2) the frequency and
nature of out-of-home placements;

(3) the magnitude,
frequency, and circumstances of the harm to the child;

(4) whether the child
has been the victim of repeated harm after the initial report and intervention
by the department or other agency;

(5) whether the child
is fearful of living in or returning to the child’s home;

(6) the results of
psychiatric, psychological, or developmental evaluations of the child, the
child’s parents, other family members, or others who have access to the child’s
home;

(7) whether there is
a history of abusive or assaultive conduct by the child’s family or others who
have access to the child’s home;

(8) whether there is
a history of substance abuse by the child’s family or others who have access to
the child’s home;

(9) whether the
perpetrator of the harm to the child is identified;

(10) the willingness
and ability of the child’s family to seek out, accept, and complete counseling
services and to cooperate with and facilitate an appropriate agency’s close
supervision;

(11) the willingness
and ability of the child’s family to effect positive environmental and personal
changes within a reasonable period of time;

(12) whether the
child’s family demonstrates adequate parenting skills, including providing the
child and other children under the family’s care with:

(A)
minimally adequate health and nutritional care;

(B)
care, nurturance, and appropriate discipline consistent with the child’s
physical and psychological development;

(C)
guidance and supervision consistent with the child’s safety;

(D)
a safe physical home environment;

(E)
protection from repeated exposure to violence even though the violence may not
be directed at the child;  and

(F)
an understanding of the child’s needs and capabilities;  and

(13) whether an
adequate social support system consisting of an extended family and friends is
available to the child.[28]

Other,
nonexclusive factors that the trier of fact in a termination case may use in
determining the best interest of the child include:

(A)     the
desires of the child;

(B)     the
emotional and physical needs of the child now and in the future;

(C)     the
emotional and physical danger to the child now and in the future;

(D)     the parental
abilities of the individuals seeking custody;

(E)     the
programs available to assist these individuals to promote the best interest of
the child;

(F)     the
plans for the child by these individuals or by the agency seeking custody;

(G)     the stability
of the home or proposed placement;

(H)     the
acts or omissions of the parent which may indicate that the existing
parent-child relationship is not a proper one; and

(I)      any excuse
for the acts or omissions of the parent.[29]

These
factors are not exhaustive; some listed factors may be inapplicable to some
cases.[30] 
Furthermore, undisputed evidence of just one factor may be sufficient in a
particular case to support a finding that termination is in the best interest
of the child.[31] 
On the other hand, the presence of scant evidence relevant to each factor will
not support such a finding.[32]

Father
admitted to committing domestic violence in L.E.M.’s presence, and the girls
both reported physically violent acts he committed against them.  L.E.M. told
him in a phone call that she did not love him, and she appears obsessed with
his violence involving the Christmas tree.  He also admitted to not completing
his service plan and stated that the goal had been for the children to be
returned to Mother, not him.  Mother stated that he missed many of his
scheduled visits with the children, and the foster mother, Williams, and Didier
all testified that the children decompensated after parental visits.  Father
further had not investigated the environment into which he would be moving his
daughters had they been returned to him at trial—he did not even know his
roommate’s last name.

On
the other hand, the foster parents have visited L.E.M. regularly at the RTC
with her sister and have begun investigating a special school for L.E.M. in the
event that she is returned to their care.  They have further committed to
obtaining regular counseling for the girls and to trying to keep the girls
together.  Applying the appropriate standards of review, we hold that the
evidence is legally and factually sufficient to support the trial court’s best
interest finding against Father.  We overrule Father’s first issue.

Due
Process Violation

In
his second issue, Father contends that the trial court’s order terminating his
parental rights violates his rights to due process under the state and federal
constitutions.  But his only argument within this issue is that his due process
rights were violated because the evidence is insufficient to support the
endangerment and best interest findings.  Because we have held otherwise, we
overrule Father’s second issue.

Dismissal
Date

In
her first issue, Mother complains that the trial court abused its discretion by
denying her motion to extend the dismissal date.  Section 263.401 of the family
code provides,

(a)
Unless the court has commenced the trial on the merits or granted an extension
under Subsection (b), on the first Monday after the first anniversary of the
date the court rendered a temporary order appointing the department as
temporary managing conservator, the court shall dismiss the suit affecting the
parent-child relationship filed by the department that requests termination of
the parent-child relationship or requests that the department be named
conservator of the child.

(b)
Unless the court has commenced the trial on the merits, the court may not
retain the suit on the court’s docket after the time described by Subsection
(a) unless the court finds that extraordinary circumstances necessitate the
child remaining in the temporary managing conservatorship of the department and
that continuing the appointment of the department as temporary managing conservator
is in the best interest of the child.  If the court makes those findings, the
court may retain the suit on the court’s docket for a period not to exceed 180
days after the time described by Subsection (a).[33]

Because
an extension of the dismissal date is similar to a continuance and section
263.401(b) does not specify which appellate standard of review should apply, we
apply the abuse of discretion standard.[34]
 We decline TDFPS’s invitation to overrule our own precedent and to
instead hold that parents may not complain of a trial court’s decision whether
to extend a suit’s dismissal date.

Mother
sought an extension of the dismissal date on November 10, 2011, less than two
weeks before trial began, and the hearing on the motion was held November 15,
2011, a week before the trial was scheduled to begin.  The stated basis for the
motion was to allow Mother more time to show TDFPS that she could “provide a
safe and appropriate home for her children.”  Mother had been in her own
apartment just two weeks when the motion was heard.

The
evidence showed that the removal occurred about nine and a half months before
the hearing on Mother’s motion to extend the dismissal date.  Mother gave the
following testimony at the hearing:

Q
[TDFPS attorney:]         But you’ve known that it’s been an issue for CPS
since the removal in January—were you aware that stable housing was an issue
for CPS and they’ve encouraged you to have stable housing?

A       Yes,
ma’am, I’m aware of that, but you have to have a job in order to be able to pay
bills.

.
. . . 

Q       Where
were you living through spring of April, May, June of this year?

A       I
was bouncing around with friends.

.
. . . 

Q       Did
you meet your caseworker Ashley Moore in May of 2011?

A       I
believe so.

Q       And
did Ashley tell you at that time that it was very important for you to have
stable housing?

A       Yes,
she did.

The trial
court had approved the service plan at a March 30, 2011 status hearing attended
by Mother’s counsel but not by Mother, who was not working at the time.  In
addition to Mother’s having not yet shown an ability to maintain stable housing
by the time of the hearing on her motion to extend the dismissal date, TDFPS
was also concerned that she had not been on her mental health prescriptions
very long and that she had not been out of a relationship with Father for at
least six months.

But
Mother had known of TDFPS’s concerns about the stability of her housing since
at least the removal, the trial court had signed the order approving the
service plans at the end of March 2011, and the caseworker had again emphasized
to Mother in May 2011 that she needed stable housing.  Given Mother’s delay in
beginning and completing her services, we cannot say that the trial court
abused its discretion by failing to find that extraordinary circumstances justified
a 180-day extension of the dismissal deadline.[35]
 We overrule Mother’s first issue.

Continuance

In
her second issue, Mother complains that the trial court abused its discretion
by denying her third motion for continuance, brought orally on the day before
the trial ended.  Mother had also raised an oral continuance regarding the same
absent witness on the first day of trial, which was denied.  An amended motion
for continuance filed on the first day of trial and a second amended motion
filed on the day before the trial ended appear in the clerk’s record.  Neither
is supported by an affidavit, and there is no indication that the trial court
ruled on either of them.

A
motion for continuance shall not be granted except for sufficient cause
supported by an affidavit, through consent of the parties, or by operation of
law.[36] 
If a motion for continuance is not made in writing and verified, it will be
presumed that the trial court did not abuse its discretion by denying the
motion.[37] 
Because Mother did not comply with rule 251, the trial court did not abuse its
discretion by denying her oral motion for continuance.[38]  Accordingly, we overrule
Mother’s second issue.

Conclusion

Having
overruled Father’s two issues and Mother’s four issues, we affirm the trial
court’s judgment.

 

PER
CURIAM

PANEL: 
DAUPHINOT,
J.; LIVINGSTON, C.J.; and GARDNER, J.

 

DELIVERED:  October 18, 2012

 



 


 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO. 02-11-00505-CV

 

 


 
 
 In
 the Interest of L.E.M. and S.G.M., Children
  
  
  
  
  
  
 
 
 §
  
 §
  
 §
  
 §
  
  
 
 
 From the 323rd District
 Court
  
 of
 Tarrant County (323-93992J-11)
  
 October
 18, 2012
  
 Per
 Curiam
 
 


 

JUDGMENT

 

This
court has considered the record on appeal in this case and holds that there was
no error in the trial court’s judgment.  It is ordered that the judgment of the
trial court is affirmed.

 

SECOND DISTRICT COURT OF APPEALS 

 

 

PER
CURIAM








 

 









[1]See Tex. R. App. P. 47.4.





[2]See Tex. Fam. Code Ann. § 161.001(1)(D)–(E)
(West Supp. 2012).





[3]Id. § 161.001(2).





[4]Tex. Fam. Code Ann. § 161.001
(West Supp. 2012); In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).





[5]Tex. Dep’t of Human
Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987); In re D.T., 34
S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh’g).





[6]Tex. Fam. Code Ann. § 161.001;
see also § 161.206(a) (West 2008).





[7]Id. § 101.007
(West 2008).





[8]In re J.F.C., 96
S.W.3d 256, 263 (Tex. 2002); see In re J.A.J., 243 S.W.3d 611,
616 (Tex. 2007) (contrasting standards for termination and modification).





[9]In re J.P.B., 180
S.W.3d 570, 573 (Tex. 2005).





[10]Tex. Fam. Code Ann. §
161.001(1)(D), (E), (2).





[11]J.P.B., 180 S.W.3d
at 573.





[12]Id.





[13]Id.





[14]Id.





[15]Id.





[16]Id. at 573, 574.





[17]Id. at 573.





[18]In re H.R.M., 209
S.W.3d 105, 108 (Tex. 2006).





[19]Tex. Fam. Code Ann.
§ 161.001; In re C.H., 89 S.W.3d 17, 28 (Tex. 2002).





[20]H.R.M., 209 S.W.3d
at 108.





[21]In re J.W., No.
02-08-00211-CV, 2009 WL 806865, at *4 (Tex. App.—Fort Worth Mar. 26, 2009, no
pet.) (mem. op.) (citations omitted).





[22]In re M.E.-M.N.,
342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet. denied).





[23]In re J.O.A., 283
S.W.3d 336, 346 (Tex. 2009).





[24]J.P.B., 180 S.W.3d
at 573.





[25]Tex. Fam. Code Ann.
§ 161.001; H.R.M., 209 S.W.3d at 108; C.H., 89 S.W.3d at 28.





[26]In re R.R., 209
S.W.3d 112, 116 (Tex. 2006).





[27]Tex. Fam. Code Ann. § 263.307(a)
(West 2008).





[28]Id. § 263.307(b);
R.R., 209 S.W.3d at 116.





[29]Holley v. Adams,
544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).





[30]C.H., 89 S.W.3d at
27.





[31]Id.





[32]Id.





[33]Tex. Fam. Code Ann. §
263.401 (West 2008).





[34]In re T.T.F., 331
S.W.3d 461, 476 (Tex. App.—Fort Worth 2010, no pet.).





[35]See In re D.K.,
No. 02-09-00117-CV, 2009 WL 5227514, at *2 (Tex. App.—Fort Worth Dec. 31, 2009,
no pet.) (mem. op.) (holding that trial court’s determination that mother who did
not visit children during pendency of case failed to present extraordinary
circumstance was not abuse of discretion); In re L.D.K., No. 02-07-00288-CV,
2008 WL 2930570, at *3 (Tex. App.—Fort Worth July 31, 2008, no pet.) (mem. op.)
(holding father who argued service plan was deficient because of misnomer
despite evidence that he knew what was expected of him failed to present any
extraordinary circumstances that would necessitate an extension); Shaw v.
Tex. Dep’t of Family & Protective Servs., No. 03-05-00682-CV, 2006 WL
2504460, at *8 (Tex. App.—Austin Aug. 31, 2006, pet. denied) (mem. op.) (holding
mother did not show that needing more time after failing to make progress on
the service plan for eight months amounted to extraordinary circumstances).





[36]Tex. R. Civ. P. 251; see
In re E .L.T., 93 S.W.3d 372, 374–75 (Tex. App.—Houston [14th Dist.] 2002,
no pet.).





[37]See Villegas v. Carter,
711 S.W.2d 624, 626 (Tex.1986); E.L.T., 93 S.W.3d at 375.





[38]See Villegas, 711
S.W.2d at 626; see also In re A.C.H., No. 02-11-00072-CV, 2012 WL
1345759, at *15 (Tex. App.—Fort Worth Apr. 19, 2012, no pet.).